UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

MODERN PLASTICS CORPORATION,

       Debtor.

_____/

NEW PRODUCTS CORPORATION,          Case No: 1:16-CV-370

         Appellant,              HON. JANET T. NEFF

v.

THOMAS R. TIBBLE et al.

         Appellees.

_____/

## OPINION

       This is an appeal from a judgment in an adversary proceeding in the Bankruptcy Court of

the Western District of Michigan. Modern Plastics Corporation ceased operations in 2008 and filed

a petition for relief under Chapter 7 of the Bankruptcy Code in January 2009. The assets in the estate

included 12 acres of real estate in Benton Harbor, Michigan, on which sat Modern Plastics' offices,

warehouse, and a manufacturing facility (the "Property"). Appellee Thomas Tibble was appointed

as the trustee for the bankruptcy estate. Appellant New Products is a creditor of Modern Plastics.

In 2013, New Products brought an adversary action against Tibble, claiming that he breached his

fiduciary duties by, among other things, failing to protect, maintain, and insure the Property, and by

failing to object to excessive tax assessments against the Property. The bankruptcy court dismissed

New Products' action after determining that Tibble did not breach any fiduciary duties during the

relevant time period. New Products appeals the dismissal of its action. Having considered the parties' briefs and the record, the Court finds that oral argument is unnecessary. For the reasons discussed herein, the Court affirms the judgment of the bankruptcy court.

## I. Background

When Modern Plastics filed for bankruptcy, the Property was encumbered by over $1.6 million in liens. Approximately $1.3 million of that amount was owed to Bank of America ("BOA"). The remaining portion was owed to state and local taxing authorities. In addition, the building on the Property was in need of maintenance and repair. The roof of the building was leaking, resulting in pools of standing water in the facility. There were also significant environmental concerns. An internal assessment by BOA estimated that clean-up costs could exceed $500,000.[1] (Siravo Dep., PageID.5367.)

A broker informed BOA that the "highest and best" use for the Property would be a redevelopment site, due to the age and condition of the building and the poor market for old industrial buildings in the area. (PageID.4158.) Similarly, an appraisal procured by BOA in March 2008 opined that redeveloping the Property would be "the only alternative to provide an adequate return on investment." (PageID.498.) The appraisal valued the Property at $1,050,000. (PageID.450.)

Shortly before the petition for bankruptcy, a developer offered to purchase the Property for $650,000. BOA agreed to this sale. After the petition for bankruptcy, Tibble sought approval of the sale from the bankruptcy court. The proposed sale included a $10,000 carve-out for the estate, but

---

[1]Shortly after the petition for bankruptcy, a potential buyer discovered that a transformer was leaking PCBs and notified state environmental authorities. The EPA subsequently incurred over $600,000 in removal and clean-up costs. (PageID.1613.)

the sale was not finalized. In August 2009, Tibble attempted to sell the Property to the same party for $590,000, including a $20,000 carve-out for the estate. BOA agreed to this sale as well, but the buyer did not exercise its option to purchase the Property.

When Modern Plastics filed its bankruptcy petition, it notified BOA and Tibble that the Property was not insured. BOA initially maintained casualty insurance on the Property, but after consulting with Tibble in November 2010, BOA decided not to continue paying for insurance coverage. Steven Siravo, BOA's loan officer in charge of Modern Plastics' account, told Tibble that the bank was not willing to put any more of its money into the Property. (PageID.416.)

During Tibble's tenure as trustee, the condition of the building on the Property deteriorated substantially as a result of vandalism, theft, and a lack of maintenance. Large quantities of metal and other materials, including structural components of the building, were taken away and sold for scrap. One scrapper worked on the site for eight hours a day, five days a week, for seven months. Eventually, the roof of the building collapsed. During this time, Tibble made no effort to secure or maintain the Property, and BOA took no action to exercise control over it.

New Products, which has offices and a manufacturing facility located across the street from the Property, initially held an unsecured claim against Modern Plastics for $19,113.82. In March 2013, it purchased the loan documents between BOA and Modern Plastics for $225,000, after much of the deterioration to the Property had already occurred. Soon thereafter, Tibble filed a report deeming the Property to be abandoned.[2] New Products subsequently brought an adversary action against the estate, Tibble, and Tibble's surety, Federal Insurance Company, seeking to recover any diminution in value of the Property during Tibble's tenure as trustee, under the theory that Tibble

---

[2]The bankruptcy court approved the abandonment on January 6, 2014, over New Products' objection.

had breached his fiduciary duties to the estate and its creditors. Following several motions for summary judgment and a bench trial focused on the value of the Property, the bankruptcy court ruled in favor of the defendants. New Products filed a motion for relief from judgment, and the bankruptcy court denied its motion. New Products appeals the bankruptcy court's rulings to this Court.

## II. Standard

The bankruptcy court's conclusions of law are reviewed *de novo*. *Rowell v. Chase Manhattan Auto. Fin. Corp. (In re Rowell)*, 359 F. Supp. 2d 645, 647 (W.D. Mich. 2004). "Under a *de novo* standard of review, the reviewing court decides an issue independently of, and without deference to, the trial court's determination." *Menninger v. Accredited Home Lenders (In re Morgeson)*, 371 B.R. 798, 800 (B.A.P. 6th Cir. 2007).

The Court applies the clearly erroneous standard when reviewing the bankruptcy court's findings of fact. *Stamper v. United States* (*In re Gardner*), 360 F.3d 551, 557 (6th Cir. 2004). "A finding of fact is clearly erroneous 'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Riverview Trenton R.R. Co. v. DSC, Ltd. (In re DSC, Ltd.)*, 486 F.3d 940, 944 (6th Cir. 2007) (quoting *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985)).

## III. Analysis

### A. The bankruptcy court properly limited New Products' claim to the period of time from March 4, 2013 to January 6, 2014.

The bankruptcy court held that New Products did not have standing as an unsecured creditor to assert a claim for breach of fiduciary duty, and did not have standing as a secured creditor until March 4, 2013, the date that BOA assigned the loan documents to New Products. (7/23/2015 Mem.

Decision & Order, PageID.1431.) Consequently, the court limited New Products' claim against Tibble to the period of time running from the date that New Products acquired the loan documents until the date that the court approved the abandonment of the Property.

New Products contends that it obtained BOA's rights to pursue a claim against Tibble. According to the assignment agreement between BOA and New Products, BOA assigned all "right, title and interest, and obligations in, to and under the Loan Documents."[3] (Loan Purchase & Assumption Agreement, PageID.1459.) In other words, BOA assigned its rights against Modern Plastics under loan agreements. BOA did not assign any rights against Tibble, let alone a right to recover from Tibble for breach of a fiduciary duty. An assignee of a mortgage stands in the same shoes as the original holder of the mortgage, with the same right to enforce the mortgage. But the right to enforce a mortgage is separate and distinct from the right to bring a tort claim against a third party based on a duty arising apart from the mortgage agreement. *See Macomb Interceptor Drain Drainage Dist. v. Kilpatrick*, 896 F. Supp. 2d 650, 660-61 (E.D. Mich. 2012) ("[T]he ability of an assignee to enforce contractually-created rights does not necessarily permit the assignee to also bring tort or statutory claims that are merely related somehow to the contractual relationship but that arose outside of the rights created by the contract."). Nothing in the assignment agreement purports to transfer anything other than the loan documents and the rights therein. Thus, BOA did not assign its right to pursue a claim against Tibble.

**B. New Products did not have standing as an unsecured creditor to bring a claim against Tibble.**

---

[3]The "Loan Documents" included a loan and security agreement, a note, a mortgage, and an assignment of rents. (Ex. A to Loan Purchase & Assumption Agreement, PageID.1474.)

The bankruptcy court also held that New Products could not pursue a claim against Tibble in its capacity as an unsecured creditor because the trustee represents the estate, not the creditors. (Pre-Trial Conf. Tr. 27-28, PageID.3227-3228.) The trustee who replaced Tibble in 2014 indicated that she was not going to pursue a claim against him. (*Id.*)

New Products acknowledges that the trustee represents the estate, but contends that the bankruptcy court could have given New Products *derivative* standing to pursue a claim against Tibble for any deterioration to the Property prior to the date of assignment of the loan documents. However, New Products never raised the possibility of derivative standing until after the court entered judgment against it.

Moreover, New Products has not shown that it met the requirements for derivative standing. "[A] party moving for derivative standing must show that: (1) a demand was made on the trustee (or debtor-in-possession) to act, (2) the trustee (or debtor-in-possession) declined, (3) a colorable claim exists that would benefit the estate, and (4) the trustee's (or debtor-in-possession's) inaction was an abuse of discretion." *Hyundai Translead, Inc. v. Jackson Truck & Trailer Repair, Inc. (In re Trailer Source, Inc.)*, 555 F.3d 231, 245 (6th Cir. 2009). Derivative standing must be "judicially approved" so that "the bankruptcy court's ability to coordinate proceedings is not impaired." *Id.*

New Products does not claim that it made a demand on the trustee that the trustee declined. Thus, it has not established that the bankruptcy court erred by failing to grant it derivative standing.

**C. The bankruptcy court properly held that Tibble did not breach his fiduciary duties.**

The bankruptcy court held that Tibble did not breach his fiduciary duties as trustee after holding a bench trial focused on the value of the Property. At the conclusion of New Products' case, the bankruptcy court held that the liens against the Property far exceeded its value. The court

observed that a trustee must exercise due diligence to conserve the assets of the bankruptcy estate, using the "'measure of care, diligence and skill required of . . . an ordinarily prudent man in the conduct of his affairs under similar circumstances and of a similar object in view[.]'" (12/18/2014 Mem. of Decision & Order, PageID.896 (quoting *Reich v. Burke (In re Reich)*, 54 B.R. 995, 998 (Bankr. E.D. Mich. 1985)).) "[I]f the Property promised no benefit to the estate [because its value did not exceed the debt secured by the mortgage and the tax liens], the Trustee would have no need or justification to use unencumbered estate resources to preserve it. Indeed, unsecured creditors could justifiably complain under those circumstances if the Trustee used estate property to benefit BOA at their expense[.]" (*Id.*)

In other words, Tibble's duties ran to multiple parties with competing interests in estate property. "The Chapter 7 trustee is an officer of the court and owes a fiduciary duty both to the debtor and to the creditors as a group." *Germain v. Conn. Nat'l Bank*, 988 F.2d 1323, 1330 n.8 (2d Cir. 1993). The trustee "'primarily represents the unsecured creditors, and represents the secured creditors only in his capacity as a custodian of the property upon which they have a lien.'" *Ford Motor Credit Co. v. Weaver*, 680 F.2d 451, 462 n.8 (6th Cir. 1982) (quoting *The Second Nat'l Bank of Nazareth v. Marcincin (In re Nadler)*, 8 B.R. 330, 333 (Bankr. E.D. Pa. 1980)). Tibble was not obligated to use estate property or resources available to the unsecured creditors in order to prop up the value of property fully encumbered by the interests of secured creditors. "[A]t no time does [the trustee] have a duty to manage assets, which have no value to the estate, for the benefit of secured creditors." *United States ex rel. The People's Banking Co. v. Derryberry (In re Peckinpaugh)*, 50 B.R. 865, 869 (Bankr. N.D. Ohio 1985); *see also In re Nadler*, 8 B.R. at 334 ("[T]he trustee could not have been expected to expend time which would not eventually or potentially have benefitted

general creditors of the estate."). "The secured creditor must exercise reasonable diligence to protect the property serving as security. The trustee must also exercise diligence to conserve the assets of the bankruptcy estate, but he is not relegated to the role of a 'babysitter' for the secured creditors." *Fox v. Anderson (In re Thu Viet Dinh)*, 80 B.R. 819, 823 (Bankr. S.D. Miss. 1987). If Tibble had taken the actions that New Products claims he should have taken, he would have used time and resources available to the general creditors of the estate, solely for the benefit of a secured creditor. Doing so would have conflicted with his duty to conserve the assets of the estate for the benefit of all the creditors of the estate.

Evidence that BOA declined to insure the Property and that the building contributed relatively little to the Property's value provides further support for the reasonableness of Tibble's actions. It would make little sense for a trustee to expend resources protecting fully-encumbered property that has minimal value for the secured creditor, let alone the estate.

Moreover, as secured creditors, BOA and New Products had means to protect their property that was not available to unsecured creditors of the estate. A secured creditor is entitled to "adequate protection" of the value of its collateral, and may obtain relief from the automatic stay in bankruptcy in order to obtain this protection. 11 U.S.C. § 362(d)(1). A secured creditor also has the right to request a condition on the use, sale, or lease of its collateral by the trustee. 11 U.S.C. § 363(e). This protection "is designed to protect a secured creditor . . . against any decrease in the value of its collateral which may result from depreciation, destruction, or the debtor's use of the collateral." *Volvo Commercial Fin. LLC the Am. v. Gasel Transp. Lines, Inc. (In re Gasel Transp. Lines, Inc.)*, 326 B.R. 683, 691-92 (B.A.P. 6th Cir. 2005) (Gregg, J., concurring). Neither BOA nor New Products ever sought the protections available to them.

New Products suggests that Tibble should have abandoned the Property as soon as he determined that it had no value for the estate, but the Bankruptcy Code did not require him to do so. *See* 11 U.S.C. § 554(a) (providing that the trustee "may" abandon property that is of inconsequential value and benefit to the estate); *see also Rambo v. Chase Manhattan Mortg. Corp. (In re Rambo)*, 297 B.R. 418, 433 n.23 (Bankr. E.D. Pa. 2003) (noting that instead of filing motions to abandon property that has inconsequential value for the estate, "most trustees do not administer (*i.e.*, seek to sell) such property, leaving the abandonment to occur at the closing of the case[.]"). Tibble had an opportunity to sell the Property with BOA's approval shortly after the petition for bankruptcy. It was not unreasonable for him to keep the Property within the estate for a period of time rather than abandon it, particularly where the sale transactions offered some benefit for the estate in the form of carve-outs from the proceeds of the sale.

New Products argues that it was presumptively improper for Tibble to attempt to sell the Property with a carve-out for the estate, though New Products does not explain why that would be the case. The estate would have benefitted from a carve-out, and the party with the greatest interest in the terms of the sale, BOA, approved it. Thus, Tibble did not breach any fiduciary duty by pursuing sale transactions with a carve-out for the estate.

New Products also contends that Tibble is liable for "waste" under Mich. Comp. Laws § 600.2919. This issue is not properly before the Court. New Products did not assert this claim in its complaint, and did not raise the issue before the bankruptcy court. "The well-established rule in the Sixth Circuit is that an appellate court will not consider arguments or issues raised for the first time on appeal unless these are exceptional circumstances. Such exceptional circumstances [exist] where either the proper decision is beyond doubt or a miscarriage of justice might otherwise result."

*Lawrence v. Jahn (In re Lawrence)*, 219 B.R. 786, 802 (E.D. Tenn. 1998); *see Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below."). New Products has not established that exceptional circumstances exist here; thus, this Court will not consider New Products' claim regarding waste.

### D. The liens on the Property far exceeded its value.

The parties stipulated that the liens on the Property totaled $1,608,610.35 on the petition date. (Stipulation of Facts, ECF No. 11-10, PageID.2815.) The issue at trial was the value of the Property, which the bankruptcy court found was not more than $650,000 on the petition date, and was approximately $590,000 on the date of BOA's assignment of the loan documents to New Products. (Findings of Fact & Concl. of L., PageID.3190.) The bankruptcy court based its determination of value primarily on the proposed sale transactions. Although the sales never completed, they were the best evidence of the Property's fair market value. The court discounted the $1,050,000 appraisal from 2008 due to a declining real estate market, which was mentioned in the appraisal report. The court also discounted a revised appraisal which valued the Property retrospectively at $930,000.00 as of the petition date, because the appraiser did not inspect the building and the environmental contamination at the Property was not considered. (*Id.*, PageID.3192.)

New Products contends that these findings are flawed, for several reasons.

#### 1. Burden of Proof

New Products contends that the bankruptcy court improperly placed the burden on New Products to prove that the Property had equity. It provides no support for this argument. Indeed, the bankruptcy court determined that, "regardless of the locus of the burden of proof," the evidence was

clear:  the liens on the Property "greatly exceeded [its] value." (3/14/2016 Mem. Decision & Ord., PageID.93.) This Court agrees. The proposed sales and the appraisals were the best evidence of the Property's value, but the liens far exceeded all of them. New Products offered no reliable evidence to demonstrate that the value of the Property exceeded the liens against it.

### 2. Carve-Outs as Equity

New Products argues that even if the liens exceeded the Property's value, there was equity in the Property because Tibble proposed to sell the Property with carve-outs for the estate. However, the bankruptcy court noted that "[a] carve-out is not equity, it is the product of a secured creditor's self-interested consent to share its collateral position with the estate, generally in exchange for disposing of collateral through the bankruptcy process, rather than through foreclosure with its attendant risks and delay." (PageID.3197.)

New Products disagrees, citing *Reeves v. Callaway*, 546 F. App'x 235, 241 (4th Cir. 2013) (holding that a "carve-out takes this case out of the 'now almost universally recognized [rule] that where the [bankruptcy] estate has no equity in the property, abandonment is virtually always appropriate because no unsecured creditor could benefit from the administration.'") (quoting *In re Feinstein Family P'ship*, 247 B.R. 502, 507 (Bankr. M.D. Fla. 2000)).

*Reeves* supports Tibble's actions. According to *Reeves*, a trustee can justifiably attempt to sell fully-encumbered property that has no value for the estate, rather than abandon the property, where the terms of the sale include a benefit for the estate. *Reeves* does not discuss whether the possibility of obtaining a carve-out imposes a duty on the trustee to administer and protect fully-encumbered property. In other words, the possibility of obtaining a carve-out for the estate may have

justified Tibble's decision not to abandon the Property, but that possibility did not necessarily require Tibble to protect the building on the Property from looting, vandalism, and deterioration.

### 3. Testimony of Michael Frederick

New Products argues that the bankruptcy court improperly excluded the testimony of its expert, Michael Frederick, on the value of the scrap hauled away from the Property. This decision is reviewed for abuse of discretion. *Conwood Co., L.P. v. U.S. Tobacco Co.*, 760 F.3d 768, 781 (6th Cir. 2002).

The bankruptcy court excluded Frederick's testimony because it was not based on "sufficient facts or data." (Trial Tr. 67, 102.)[4] *See* Fed. R. Evid. 702(b). In addition, much of Frederick's testimony was based on information not disclosed in his expert report, and this unfairly surprised the defendants. (*Id.* at 67.) Frederick's expert report merely stated that he visited the Property on two occasions and that he estimated that the scrap value of the materials removed from the manufacturing facility would be "approximately $1.5 - $2.0 million dollars." (Frederick Rep., PageID.1723.) The report included some pictures of the Property and a square-foot cost guide for building new construction, without explaining how the guide was used. Before trial, the bankruptcy court held that Frederick would not be permitted to stray from his report when testifying. (Order Regarding Mot. in Limine, PageID.2752.)

At trial, Frederick explained that he used an unidentified website to determine historical prices of scrap metal. (Trial Tr. 79.) To estimate the quantity of recoverable materials in the building, he relied on a drawing of the building that was not in evidence, which apparently showed where the machines in the building had been located. He also spoke with two subcontractors to try

---

[4]The trial transcript is available from the bankruptcy court. It was not filed in this Court.

to reverse-engineer the construction of the building and the location of wiring, pipes, ducts, and other materials that would have value for sale as scrap. (*Id.* at 78-79.) He then made assumptions based on "best practices" for construction and "any uniqueness in the building and pathways." (*Id.* at 82.) He acknowledged that any estimate would not be fully accurate without a schematic showing what had actually been in the building. (*Id.*) His estimate did not include the labor cost for removing the scrap. (*Id.* at 86.)

The court's decision was not an abuse of discretion. Frederick's opinion testimony was problematic in many respects. His expert report merely asserted a value without explaining how he arrived at that number. It became clear at trial that much of his opinion was dependent upon the method and cost of building a new facility; however, the cost of materials that might be used in building a new facility may be quite different from the value of the scrap that can be recovered from a much older one. Frederick apparently spoke with several subcontractors to arrive at his estimate, but he provided little detail about the nature of these conversations and how they were used in his calculations. In addition, he used an unidentified website to calculate the value of scrap material. Considering Frederick's questionable assumptions and the lack of concrete, reliable support for his estimate, the bankruptcy court properly excluded his testimony.

4. Estoppel

New Products asserts that Tibble should be judicially and/or equitably estopped from claiming that the Property had no value for the estate because he filed several reports with the bankruptcy court indicating otherwise. In March 2009, he reported the net value of the Property as $600,000. In September 2010, he reported the net value as $150,000, and in June 2013, he reported it as $25,000. Finally, in July 2014, he reported the net value as $0. At trial, Tibble testified that the

$600,000 value was based solely on his awareness of a proposed sale for $600,000; he had not examined the liens. (Trial Tr. 125.) It was not his position that the Property was worth more than the liens. (*Id.* at 167.) He did not realize that his reports would be filed with the court; he thought they were for internal use. (*Id.* at 174.)

*(a) Judicial Estoppel*

"In the bankruptcy context, . . . 'judicial estoppel bars a party from (1) asserting a position that is contrary to one that the party has asserted under oath in a prior proceeding, where (2) the prior court adopted the contrary position either as a preliminary matter or as part of a final disposition.'" *White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 476 (6th Cir. 2010) (quoting *Browning v. Levy*, 283 F.3d 761, 775-76 (6th Cir. 2002)) (internal quotation marks omitted). "[J]udicial estoppel is inappropriate in cases of conduct amounting to nothing more than mistake or inadvertence." *Browning*, 283 F.3d at 776.

Tibble's statements do not satisfy the conditions for judicial estoppel. First, Tibble's reports were not asserted under oath in a prior proceeding. They were not even signed.

Second, the bankruptcy court expressly determined that it did not adopt the statements in Tibble's reports as a preliminary matter or as part of a final disposition. (10/15/2015 Order Denying Parties' Summ. J. Mots., ECF No. 11-8, PageID.2230.) The bankruptcy court relied on Tibble's reports to find that a question of fact existed as to whether there was equity in the Property. (12/18/2014 Mem. of Decision & Order, PageID.898.) It did not adopt them as the position of the court. If it had, then there would have been no need for a trial to determine whether the value of the Property exceeded the liens against it.

Third, the bankruptcy court found that Tibble's reports of net value in the Property were the result of "carelessness or inattention." (Findings of Fact & Concl. of L., PageID.3190.) Thus, judicial estoppel does not apply. *See Browning*, 283 F.3d at 776 (noting that judicial estoppel is inappropriate for cases of mistake or inadvertence).

*(b) Equitable Estoppel*

As to equitable estoppel, the Court cannot find any evidence that New Products raised this issue before the bankruptcy court. *See Hormel v. Helvering*, 312 U.S. 552, 556 (1941) ("Ordinarily an appellate court does not give consideration to issues not raised below."). In any event, the argument is without merit. "A party may invoke equitable estoppel to prevent the opposing party from changing positions if (1) the party was an adverse party in the prior proceeding; (2) the party detrimentally relied on the opponent's prior position; and (3) the party would now be prejudiced if the opponent changed positions." *Teledyne Indus., Inc. v. N.L.R.B.*, 911 F.2d 1214, 1220 (6th Cir. 1990). "Equitable estoppel may apply regardless of judicial acceptance of the party's original position, because equitable estoppel protects litigants instead of the integrity of the courts." *Id.*

There is no evidence that New Products detrimentally relied on any position or statement of Tibble. New Products claims that it relied on Tibble's "stewardship" of the Property when it purchased the mortgage from BOA. However, nothing in the record indicates that Tibble ever stated or took the position that he would maintain or protect the Property.

5. Permitting New Products to be Fully Heard on Appraisal Value

New Products claims that the bankruptcy court did not permit it to be fully heard on the three approaches to appraisal value: the sales comparison approach, the income approach, and the cost approach. For instance, it contends that it was not permitted to cross-examine Robert Essa, who

conducted appraisals of the Property in 2008 and 2015 using the sales comparison and income approaches. These appraisals were offered into evidence by New Products (Trial Tr. 48, 253), but New Products complains that they were flawed. New Products asserts that it could have cross-examined Essa about these flaws and Essa's failure to use a cost approach, but it was not able to do so because the bankruptcy court ruled in Appellees' favor as a matter of law under Rule 52(c) after New Products rested its case. Appellees had identified Essa as one of their witnesses, but they did not call him to the stand because they obtained a judgment in their favor at the conclusion of New Products' case.

Similarly, New Products contends that it was not permitted to cross-examine realtor James Ringler, who listed the Property before the bankruptcy proceedings and determined that the best use of the Property would be for it to be marketed as a redevelopment site. Appellees offered his report into evidence and New Products did not object (Trial Tr. 313). Appellees had listed Ringler as one of their witnesses, but they did not call him to testify because the court ruled in their favor on the Rule 52 motion.

Rule 52(c) of the Federal Rules of Civil Procedure permits a court to rule against a party on a particular issue if that party has been "fully heard" on that issue. Fed. R. Civ. P. 52(c). New Products cannot complain that it was not fully heard on the issue of valuation because the court allowed it to present all of its evidence on this issue. If New Products wanted the court to hear testimony from Essa or Ringler about their reports, New Products should have called them as witnesses in support of its own case. Otherwise, it should have objected to the admission of their reports without their testimony. Or, New Products could have presented competent evidence of the value of the Property from its own expert, rather than rely on the testimony of Frederick. The

bankruptcy court did not prevent New Products from doing any of these things and, thus, did not prevent it from being fully heard. *See EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 274 n.23 (3d Cir. 2010) (rejecting a similar claim).

### 6. Findings by the Court Not Supported by the Evidence

New Products contends that the bankruptcy court made findings that were not supported by the evidence or were beyond the scope of the trial, such as the following: (1) in 2008, "deferred maintenance compromised the integrity of the roof, resulting in pools of standing water within the building" (Findings of Fact & Concl. of L., PageID.3188); (2) "it must have been clear to the Trustee, after the [assignment of the loan documents to Products], that he could no longer count on cooperation from the holder of the principal secured claim against the Property" (*Id.*, PageID.3187); (3) the 2008 appraisal expressed "reservations about a declining real estate market" (*Id.*, PageID.3189); (4) "it was the location of the Property, rather than the structures built upon it, that accounted for most of the value" (*Id.*, PageID.3191); (5) New Products' CEO, Cheryl Miller, was aware that materials were being stolen from the Property to be sold for scrap (*Id.*, PageID.3192); (5) Miller would not have authorized New Products to purchase the loan documents from BOA without entering the Property "unless the condition of the building was immaterial to her decision" (*Id.*, PageID.3192); and (6) New Products "took a cavalier approach to the building" after receiving assignment of the loan documents (*Id.*, PageID.3193).

#### *(a) Roof leaks and deferred maintenance*

The roof leaks and deferred maintenance are supported by the deposition testimony of Ronald Miller, who worked as an advisor for Modern Plastics in 2008. He testified that the "roof was leaking in multiple places, probably [because] there was a lot of deferred maintenance. [It]

17

didn't appear as though the company had been investing in the building for quite a long time." (Miller Dep., PageID.5230-5231, 5300.) In addition, Siravo testified that he saw a puddle of water inside the building when he visited it in 2008. (Siravo Dep., PageID.5340.) The parties agreed to the admission of this deposition testimony. (Trial Tr. 244.)

*(b) Cooperation from New Products*

The court's statement that Tibble must have assumed that he could not count on New Products' cooperation after it obtained rights to the loan documents from BOA was speculation by the court regarding the reason for the timing of Tibble's abandonment of the Property; it was not a finding material to the court's decision regarding the value of the Property or Tibble's duties in relation to it.

*(c) Reservations about a declining real estate market*

The court's reference to reservations expressed in the appraisal report about a declining real estate market can be found in the report. (PageID.477, 497, 515.)

*(d) Location of the Property*

The court's conclusion that the location of the Property, rather than the structures on it, likely accounted for most of its value is supported by the evidence cited by the court in its opinion, including a broker opinion that the highest and best use for the site was as a redevelopment site, and New Products' decision to purchase the Property without examining the building.

*(e) Miller's awareness of scrapping activity*

The court found it "difficult to believe" that New Products' CEO Cheryl Miller was unaware of the scrapping activity at the Property because the scrappers regularly hauled truckloads of material away from the Property, which was across the street from her office. (Findings of Fact &

Concl. of L., PageID.3192.) This is a reasonable inference from the record. New Products contends that it could have offered additional evidence to explain her lack of awareness, but ultimately, the reason for her awareness or lack thereof is immaterial. When or not she was aware of scrappers removing materials from the building, she agreed to purchase the Property without examining the condition of the building. She may have thought that the building was in good condition, but it was reasonable for the bankruptcy court to infer that she acted as she did because the condition of the building was not important to her decision.

*(f) Miller's decision to purchase the property without examining it*

As indicated, it was reasonable for the court to infer that Miller likely would not have authorized New Products to purchase the loan documents from BOA without first examining the condition of the building on the Property, unless that condition was not material to her decision. New Products asserts that the bankruptcy court prevented it from offering evidence that Miller could not access the interior of the Property because she could not obtain the requisite insurance that would allow her to do so. As the court stated at trial, however, it does not matter *why* Miller did not examine the interior of the Property; the fact remains that she was willing to purchase the Property without doing so. This willingness tends to support the court's conclusion that the condition of the building was less important than its location. Indeed, Miller herself testified that she had several reasons for purchasing the Property: she wanted a building to use for possible future expansion, she wanted a "buffer" against incompatible uses of New Products' property, and she wanted to subdivide a portion of the land into lots and sell them off. (Trial Tr. 292-93, 296.) Two of those reasons (buffer and subdivision) have no necessary connection to the condition of the building.

*(g) New Products' "cavalier" approach to the building on the Property*

The court also found that New Products took a "cavalier" approach toward the building on the Property after it purchased the loan documents from BOA, because it did not seek any form of relief from the bankruptcy court in order to obtain protection for the Property. This finding is supported by the docket in the bankruptcy case. New Products asserts that it was not able to present evidence of actions that it did take, including the fact that it employed security guards and installed a security camera and new locks to protect the building, but this Court cannot find any instance in which the bankruptcy court prevented it from presenting this evidence.

### 7. Permitting New Products to be Heard on Other Issues

New Products asserts that it was not given an opportunity to question Tibble about his communications with BOA to determine whether BOA was aware of the theft and vandalism occurring at the Property. New Products contends that there is a difference between allowing Tibble to maintain custody of the Property while trying to sell it and knowingly allowing the Property to be looted or vandalized. However, New Products fails to explain the significance of this distinction. Siravo told Tibble that BOA did not want to insure the Property or put any more of its money into it. BOA clearly believed that the Property was not worth additional expenditure.

### 8. Failure to Consider the Whole Estate

New Products also contends that the court should have considered the value of the entire estate, and should have "spread out" the liens on the Property to all the assets of the estate. However, New Products provides no justification for this approach. The issue in the adversary proceeding was whether Tibble was justified in treating the Property as he did. The liens attached to the Property, not the whole estate. The Court cannot pretend otherwise.

In short, New Products has not shown that the bankruptcy court's factual findings are clearly erroneous or that its legal conclusions are incorrect.

## IV. Motions to Supplement

### A. New Products' Motion

New Products has filed a motion to supplement the record with evidence of the results of proceedings before the Michigan Tax Tribunal (ECF No. 29). New Products apparently challenged the tax assessments on the Property for the years 2014 and 2015 and has obtained a consent judgment reducing those assessments and obtaining a tax refund. New Products seeks to supplement the record in this case with documents from those proceedings.

Rule 8009 of the Federal Rules of Bankruptcy Procedure permits the record to be supplemented in the following ways: on stipulation of the parties; by the bankruptcy court before the record is forwarded to the appellate court; or by the court where the appeal is pending. Fed. R. Bankr. P. 8009(e)(2). Generally, Rule 8009, which was formerly Rule 8006, "'does not permit items to be added to the record on appeal to the district court if they were not part of the record before the bankruptcy court.'" *Amedisys, Inc. v. JP Morgan Chase Manhattan Bank (In re Nat'l Century Fin. Enters., Inc.)*, 334 B.R. 907, 917 (Bankr. S.D. Ohio 2005) (quoting *Zer–Ilan v. Frankford (In re CPDC, Inc.)*, 337 F.3d 436, 443 (5th Cir. 2003)); *see In re McKenzie*, No. 08–16378, 2013 WL 5309008, at *4 (Bankr. E.D. Tenn. Sept. 19, 2013) ("The general rule for designation of the record is that only items considered by the bankruptcy court in reaching a decision should be included.").

The materials that New Products offers were not presented to the bankruptcy court. New Products offers no justification for avoiding the general rule that this Court should consider only items presented to the bankruptcy court. Moreover, it is not clear how the consent judgment and

related materials are relevant to the bankruptcy court's decision. The bankruptcy court granted Tibble's request to abandon the Property on January 9, 2014. Tibble had no duty with respect to the Property after that time. It is not clear what Appellant claims that Tibble could or should have done for the tax years 2014 and 2015. Accordingly, New Products' motion is denied.

### B. Appellees' Motion

Appellees have filed a motion to "supplement" their briefing with supplemental authority. (ECF No. 35.) The motion merely provides notice of a recent decision that, according to Appellees, bears on the issue of whether a carve-out is equity. New Products has not opposed the motion. Accordingly, the motion is granted.

### V. Conclusion

The bankruptcy court did not err in concluding that Tibble did not breach his fiduciary duties. When Modern Plastics filed its petition for bankruptcy, the Property had no value for the estate because the liens against it greatly exceeded its value. Consequently, any resources expended by the trustee to protect or maintain the building, or to challenge tax assessments on the Property, would deplete resources available to the estate solely for the benefit of a secured creditor, to the detriment of the other creditors of the estate. Tibble had a duty to conserve the assets of the estate for all creditors, not just BOA and New Products. Further, any decision not to protect or insure the building was reasonable considering the conduct of the secured creditor with the greatest interest in the Property and the value of the building in relation to the value of the Property as a whole.

An order will enter consistent with this Opinion.


Dated: September 22, 2017                       /s/ Janet T. Neff
                                                JANET T. NEFF
                                                United States District Judge